**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

| | |
|---|---|
| VERASUN FORT DODGE, L.L.C., a Delaware Limited Liability Company,, | |
| Plaintiff, | No. C07-3013-MWB |
| vs. | |
| INDUSTRIAL AIR TECHNOLOGY CORP., a Michigan Corporation, | |
| Defendant, | |
| and | |
| INDUSTRIAL AIR TECHNOLOGY CORP., a Michigan Corporation, | **MEMORANDUM OPINION AND ORDER REGARDING THE PARTIES' CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND SUMMARY JUDGMENT** |
| Defendant/Third-Party Plaintiff, | |
| vs. | |
| JOHN ZINK COMPANY, L.L.C., | |
| Third-Party Defendant. | |

_____

**TABLE OF CONTENTS**

*I.  INTRODUCTION AND BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . 2
  *A.  Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
  *B.  Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*II.  LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
  *A.  Summary Judgment Standards* . . . . . . . . . . . . . . . . . . . . . . . . 22

**B. Analysis Of Issues** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
      **1.**    **Choice-of-law determination** . . . . . . . . . . . . . . . . . . . . . 26
      **2.**    **Terms and conditions of contract** . . . . . . . . . . . . . . . . . . 27
             *a.*  *The offer* . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
             *b.*  *The counteroffer* . . . . . . . . . . . . . . . . . . . . . . . . 32
             *c.*  *Acceptance* . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
      **3.**    **Contribution and indemnification claims** . . . . . . . . . . . . . . 39

**III. CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

## I. INTRODUCTION AND BACKGROUND

### A. Procedural Background

On February 25, 2008, plaintiff VeraSun Fort Dodge, L.L.C. ("VeraSun") filed its Amended Complaint in this matter against Industrial Air Technology Corp. ("IAT"). VeraSun is in the business of producing ethanol. IAT is in the business of designing, manufacturing, and selling industrial equipment, including industrial fans. VeraSun alleges in its Amended Complaint that fans manufactured by IAT failed, with one exploding, causing damage to VeraSun's ethanol plant and forcing a shut down of the plant. VeraSun asserts claims against IAT for negligence, strict liability, breach of implied warranties, and breach of contract.

On February 26, 2008, IAT filed its answer to VeraSun's Amended Complaint and filed an Amended Third-Party Complaint against John Zink Company, L.L.C. ("John

Zink"). John Zink is in the business of specifying, selling, manufacturing and assembling thermal oxidizer equipment. John Zink contracted to manufacture two thermal oxidizers for use in VeraSun's ethanol plant and in turn contracted with IAT for the purchase of two induced draft fans for use in the theremal oxidizer units. In IAT's Amended Third-Party Complaint, IAT asserts a claim for contribution against John Zink based on John Zink's alleged comparative fault and a contractual indemnity claim against John Zink.

On March 21, 2008, John Zink filed its answer to IAT's Amended Third-Party Complaint. In its answer, John Zink included a counterclaim against IAT based on contractual indemnity. On April 21, 2008, IAT filed an amended and substituted answer to John Zink's counterclaim.

All of the parties to this case have filed cross-motions for partial summary judgment or summary judgment. In John Zink's motion for summary judgment, John Zink argues that the contract for the sale of the induced draft fans is governed by its terms and conditions. On the other hand, in IAT's motion for summary judgment, IAT contends its terms and conditions are controlling. In its Motion For Partial Summary Judgment, plaintiff VeraSun seeks a declaration that IAT's terms and conditions did not become part of the contract between IAT and John Zink. In IAT's Cross-Motion For Summary Judgment against VeraSun, IAT requests that the court rule that IAT's terms and conditions are the applicable and controlling terms and conditions involved in this matter and, under those terms and conditions, conclude that IAT is entitled to indemnification and contribution from VeraSun and that VeraSun's claims fail as a matter of law. John Zink also seeks summary judgment against IAT on IAT's contribution claim against it, arguing that IAT's contribution claim fails as a matter of law. John Zink also seeks summary judgment on IAT's contractual indemnity claim, arguing that IAT's indemnity claim fails as a matter of law because the terms of IAT's sales rider did not become part of the parties' contract. IAT

seeks summary judgment on its contribution and/or indemnity claims against John Zink, contending that John Zink is obligated to indemnify and hold harmless IAT from the claims against it.

Oral argument on the parties' motions for partial summary judgment, summary judgment, and cross-motions for summary judgment was held on November 13, 2008. At oral argument, plaintiff VeraSun were represented by Douglas R. Archibald of Terhaar, Archibald, Pfefferle & Griebel, L.L.P., Minneapolis, Minnesota. Defendant/third-party plaintiff IAT was represented by R. Todd Gaffney of Finley, Alt, Smith, Scharnberg, Craig, Hilmes & Gaffney, P.C., Des Moines, Iowa. Third-party defendant John Zink was represented by Wade R. Hauser III of Ahlers & Cooney, P.C., Des Moines, Iowa. The court was exceptionally impressed with the quality of the briefs in this matter as well as the cordial and professional manner in which counsel engaged in spirited, well-prepared and highly informative oral arguments on the issues. All of the matters before the court are now fully submitted.

### B. Factual Background

The summary judgment record reveals that the following facts are undisputed. Plaintiff VeraSun is a Delaware limited liability company with its principal place of business in Fort Dodge, Iowa. VeraSun is in the business of making ethanol. Defendant IAT is a Michigan corporation with its principal place of business in Michigan. IAT is in the business of designing, manufacturing, and selling industrial equipment, including industrial fans. Third-party defendant John Zink is a Delaware limited liability company with its principal place of business in Tulsa, Oklahoma. John Zink is in the business of specifying, selling, manufacturing, and assembling thermal oxidizer equipment. Thermal oxidizers are air pollution control systems which incinerate toxins in industrial exhaust.

Osborn Equipment Sales, Inc. ("Osborn") is a manufacturers' representative and at all material times acted as IAT's agent in IAT's transaction with John Zink.

Matt Janes is a former employee of VeraSun who at one time was VeraSun's Chief Operating Officer and Vice President of Technology. The Fort Dodge VeraSun plant was the second VeraSun plant built. Janes's role for VeraSun at the Fort Dodge plant was to develop the project for construction of the plant and provide the overall project management through the entire project, from the selction of the site, engineering, construction, start-up and operation. ICM was an engineering company contracted by VeraSun to be the enginer of the Fort Dodge plant and ICM provided process engineering, detailed engineering and was also an equipement supplier.

VeraSun hired Fagen, Inc. ("Fagen") to act as a general contractor in the construction of its new ethanol plant in Fort Dodge, Iowa. On February 1, 2005, Fagen, acting on behalf of VeraSun, entered into a contract with John Zink for the purchase of two thermal oxidizer systems that were to be installed in VeraSun's ethanol plant in Fort Dodge. The cover letter to the purchase order contained the following language: "All commercial terms and conditions of this purchase order have been negotiated and agreed to with VeraSun Fort Dodge, LLC and are presented in proposal TG-45824, Rev D, and shall be upheld." Fagen Purchase Order, John Zink's App. at 89. Janes was the main person involved for VeraSun and did some of the negotiations, although VeraSun's legal department and others were involved as well. The contract between VeraSun and John Zink was a commercial contract, the terms of which were bargained for and negotiated by the parties and were agreed upon by both John Zink and VeraSun. One of the terms which was negotiated and agreed upon by VeraSun and John Zink was as follows:

> Goods not manufactured by Seller are subject only to warranties
> of Seller's suppliers. When issuing orders to its suppliers for

> goods to be incorporated into the TO/HRSG system, the Seller
> shall have purchase orders including provisions setting forth
> that the Seller shall have the right to assign, and shall assign, to
> the Buyer all warranties and guarantees, which the Seller's
> suppliers extend to Seller.

Fagen Purchase Order, John Zink's App. at 93. Janes understood this to mean that if a component of the system was purchased by John Zink and installed, it would be the component manufacturer's warranty which would apply to that item as opposed to John Zink's warranty.

On February 23, 2005, John Zink submitted to Osborn a request for proposal for two counterclockwise rotating induced draft fans. The fans were to be incorporated into two thermal oxidizer systems John Zink had contracted to supply for VeraSun's Fort Dodge ethanol plant. Osborn forwarded the bid request to IAT. On March 3, 2005, IAT, through Osborn, sent a quotation to John Zink, quoting a price of $170,020.00 for the two fans. This reflects a base price of $159,150.00 for the fans as well as $10,870.00 for optional lubrication systems for the fans.

On March 10, 2005, John Zink faxed a purchase order to IAT. Paul Benson was listed as the "buyer" on the purchase order. The John Zink purchase order referenced a "PO Number" 645314, and provided for the purchase of two induced draft fans at a total purchase price of $170,020.00. The purchase order expressly provided that "[t]his purchase order is buyer's offer to seller and acceptance is expressly limited to its terms and conditions as set forth herein." Purchase Order, John Zink's App. at 103-04. Benson prepared the purchase order for the purchase of the two IAT fans. To prepare a purchase order, one pulls a program up on the computer, enters certain information regarding pricing and engineering notes and then hits print. When the purchase order is printed, John Zink's terms and conditions also print automatically with the purchase order. After hitting print

for the purchase order for the two IAT fans, the purchase order would automatically be faxed to IAT. John Zink's terms and conditions are automatically sent with the purchase order to the customer. When John Zink issues the purchase order and sends its terms and conditions, if there is some part of the terms and conditions which a customer does not like, then it is incumbent on the customer to contact John Zink and tell them of their concern. If John Zink does not hear back from a customer after sending the purchase order and the John Zink terms and conditions, then John Zink assumes that there is an acceptance of those terms and conditions.

John Zink's terms and conditions were attached to the purchase order. John Zink's terms and conditions provided, under the heading labeled "ACCEPTANCE OF ORDER," that "Seller's shipment of or furnishing of Goods, acknowledgment of this Order, or commencement of performance or acceptance of any payment shall constitute conclusive evidence of Seller's acceptance of this Order." Purchase Order, John Zink's App. at 105, 109. John Zink's terms and conditions contained a choice-of-law clause providing that "[t]his Order shall be governed by the laws of Oklahoma. . ." Purchase Order, John Zink's App. at 105, 111. John Zink's terms and conditions also contained an indemnification provision that provided as follows:

> **15. INDEMNIFICATION**. TO THE FULLEST EXTENT
> ALLOWABLE BY APPLICABLE LAW, SELLER SHALL,
> AT ITS EXPENSE, DEFEND, INDEMNIFY AND HOLD
> HARMLESS BUYER AND ITS AFFILIATE AND PARENT
> COMPANIES, THEIR SUCCESSORS AND ASSIGNS,
> CUSTOMERS, AND USERS OF THE GOODS, AGAINST
> ALL DAMAGES, LOSS, COSTS, CLAIMS, LIENS,
> ENCUMBRANCES, LIABILITIES, AND EXPENSES
> (INCLUDING ATTORNEY'S FEES) ARISING OUT OF OR
> RESULTING FROM ANY ACT OR OMISSION OF SELLER,
> ITS AGENTS, EMPLOYEES, SUPPLIERS OR

> SUBCONTRACTORS, PROVIDED THAT SELLER WILL
> NOT BE LIABLE FOR DAMAGES, LOSSES, COSTS,
> CLAIMS, LINES, ENCUMBRANCES, LIABILITIES, AND
> EXPENSES TO THE EXTENT ARISING OUT OF BUYER'S
> SOLE NEGLIGENCE.

John Zink Purchase Order, John Zink's App. at 105, 111.

It was IAT's company policy to not accept the terms and conditions of its customers. On March 21, 2005, IAT, through its agent, Osborn, faxed John Zink two documents which were each entitled "Order Acknowledgment." The fax cover sheet sent with the two order acknowledgments contained a note from Keith Garoutte at Osborn, which provided as follows:

> Paul,
>
> Attached is a copy of the order Acknowledgments for the above
> referenced Purchase Order. I looked it over and everything
> looked OK. Could you please take a couple of minutes and see
> if everything is correct. If you have any questions, please call.
>
> Thanks,
> Keith

Fax cover sheet, John Zink's App. at 112.

The fax cover sheet and the two order acknowledgments each referenced P.O. #645314, the same purchase order number listed on John Zink's purchase order. The order acknowledgments each provided for the sale of a single induced draft fan at a purchase price of $85,010.00, for a total purchase price of $170,020.00, and provided for a shipping date of May 20, 2005. The order acknowledgments detailed the specifications for the fans, including that the fans would have a "CCW." or counterclockwise, rotation. The order acknowledgments did not contain any objections to the John Zink terms and conditions nor make any mention of any IAT terms and conditions.

On March 21, 2005, the same day that the order acknowledgments were faxed to John Zink, IAT began ordering parts for the two fans from third-party suppliers. On March 21, 2005, IAT placed orders with at least four different vendors for fan parts costing several thousand dollars.

On March 23, 2005, Paul Melton, Senior Principal Engineer for John Zink, sent an e-mail to Jerry McComb at IAT that read as follows:

> Hello Jerry,
>
> We were looking at the drawings you just sent and found the blowers are CCW. If the rotation is defined from the motor side, we really need CW blowers. I apologize if we gave you the wrong information. Would you please have the drawings revised and reissued.
>
> Thanks!
>
> Best Regards,
> Paul F. Melton, P.E.

Letter, John Zink's App. at 116.

On March 24, 2005, IAT revised the drawings of the fans to reflect the change in rotation from counterclockwise to clockwise. On March 30, 2005, IAT, through its agent, Osborn, submitted to John Zink two more order acknowledgments. These order acknowledgments were identical to the first two in all significant respects except that they changed the rotation of the fans from counterclockwise to clockwise, as requested by Paul Melton. Like the first two order acknowledgments, the March 30, 2005, order acknowledgments did not contain any reference to any additional terms and conditions, and did not disclaim or object to any of the John Zink terms and conditions. The fax

cover sheet preceding the order acknowledgments contained a note from Keith Garoutte which provided as follows:

> Paul,
>
> Sorry, but I guess I had my head stuck up my ____.
> Attached is a copy of the revision that Paul Melton knows about. I guess you guys changed the rotation.
> Lets [sic] try and do a lunch next week?
> If you have any questions, please call.
>
> Thanks,
> Keith

Fax cover sheet, John Zink's App. at 130.

Omni Metalcraft in Alpena, Michigan, provides credit and collection services to IAT. Diane Leeseberg is a credit manager with Omni Metalcraft. On March 10, 2005, Leeseberg, on behalf of IAT, faxed completed EFT Request and Supplier Profile forms to Malcolm Nash in John Zink's Purchasing Department. Nash worked as an administrative assistant in the John Zink Purchasing Department. Nash's responsibilities included keeping track of vendor files and doing some programing and other information technology work. On March 14, 2005, Nash mailed a "Letter Agreement" to Mary Jo Shayler at IAT. The March 14, 2005, "Letter Agreement" was received by IAT on or about March 21, 2005. Leeseberg received John Zink's "Letter Agreement" sometime after March 21, 2005. Upon reviewing the "Letter Agreement," Leeseberg learned that John Zink wanted IAT to sign and agree to John Zink's Purchase Terms and Conditions which were attached to the "Letter Agreement" as Exhibit C.

On April 1, 2005, Leeseberg called Nash in response to the "Letter Agreement" he sent IAT on March 14, 2005. Nash was unavailable so she left him a voicemail asking him to call her back. Sometime after that, Leeseberg and Nash spoke on the telephone,

and Leeseberg informed Nash that IAT was unwilling to agree to John Zink's terms and conditions, which had been attached to the March 14, 2005, "Letter Agreement." These are the same terms and conditions that were attached to the March 10, 2005, purchase order. Leeseberg also told Nash that IAT would not be able to take the order if John Zink and IAT could not come to an agreement. According to Leeseberg, if IAT had not received the March 14, 2005, "Letter Agreement," she would not have contacted John Zink about the terms and conditions. Leeseberg testified in her deposition, taken on November 7, 2007, that: "I have no doubt the purchase order was accepted, but the terms in my mind were not, whether they were attached or not." Leeseberg Dep. at 51, John Zink's App. At 65. Leeseberg also acknowledged that she does not have any opinion and would not be qualified to render a legal opinion about whether IAT was already bound to the John Zink terms and conditions before she called Nash. Leeseberg has never seen the John Zink purchase order or the IAT order acknowledgments.

Nash was unwilling to negotiate on IAT signing the "Letter Agreement" and he told Leeseberg that he did not have authority to waive the terms and conditions of signing. Leeseberg indicated that she needed to speak to someone either above him or someone who had authority to make a decision on either cancelling the order or agreeing that IAT would not sign John Zink's terms and conditions.

During their telephone conversation, Nash indicated that Leeseberg would have to speak to someone else and referred Leeseberg to Paul Benson. At the time, Benson was a senior buyer for John Zink. Benson had the authority to take and request quotations for different types of equipment and he had authority on behalf of John Zink to enter into contracts with suppliers. Benson, however, did not have authority to agree to any deviations and amendments to John Zink's terms and conditions for the purchase order for the two IAT fans.

On April 1, 2005, Nash sent an e-mail to Benson in which he wrote in pertinent part:

> Paul,
>
> The above-referenced vendor will not execute our standard letter agreement (which incorporates our terms & conditions). Today I received a phone call from Diane Leeserg (989-358-7044) who said they might be willing to negotiate terms with you. . . .
>
> Diane said you could call her back at 989-358-7044 or speak with your [sic] supervisor, Paul Diamond (989-358-7010). Since you are the buyer who initiated the first purchase with this vendor, I am turning this matter over to you for handling.

Nash e-mail, IAT's App. At 58.

On April 28, 2005, Leeseberg telephoned Benson and explained to him that IAT was unwilling to agree to John Zink's terms and conditions. Leeseberg only spoke to Benson on that one occasion. Leeseberg did not know what Benson's job title or authority was at John Zink at the time she spoke with him. Leeseberg had the impression that Benson had more authority than Nash. Leeseberg asked Benson if she could send him IAT's terms and conditions. Benson responded that she could and that he would forward them to the John Zink legal department. Leeseberg did not talk to Benson about any details of the IAT terms and conditions. During their telephone conversation, Benson did not know the details of the IAT terms and conditions.

On April 28, 2005, following their telephone conversation, Leeseberg faxed Benson a document entitled "Terms of Sale Rider-Standard Terms and Conditions of Sale." The fax cover sheet contained the following note:

> Good afternoon, Paul, following please find our Terms and Conditions of Sale for your file. I greatly appreciate speaking

> with your [sic] and appreciate your working with us regarding these terms. Have a great evening.

Fax cover sheet, John Zink's App. at 146.

> IAT's terms and conditions provided, in part, as follows:

>> 1. Acceptance of Seller's Terms and Conditions of Sale. Customer has read and understands these Terms. Customer agrees that (I) Customer's written acceptance of these Terms (Including Customer's issuance of a purchase order), (ii) Customer's acceptance of any goods or services from Seller, or (iii) Customer's payment for any goods or services constitutes Customer's acceptance of these Terms as the sole terms and conditions governing the sale by the Seller to Customer. Customer expressly acknowledges and agrees that all terms and conditions proposed by Customer which are different from or in addition to these Terms are unacceptable to Seller, are hereby expressly rejected by Seller, and shall not become a part of the contract between Customer and Seller. No variation of these Terms shall be effective unless expressly agreed to by the Seller's President or his designated representative in writing.

IAT Terms and Conditions, John Zink's App. at 147.

> IAT's terms and conditions also provided:

>> 3. Quotations. All quotations are for information only and are not an offer by the Seller. An order by a Customer shall not constitute a contract between it and the Seller unless it has been accepted by the Seller in writing, which acceptance shall be deemed to occur at the Seller's offices in Gaylord, Michigan.

IAT Terms and Conditions, John Zink's App. at 147. IAT's terms and conditions also contained the following provision:

>> 10. Customer's Obligations. Customer agrees that (I) before ordering the Equipment, Customer shall determine the

suitability of the Equipment for Customer's intended use and shall assume all risk and liability whatsoever in connection with that determination; (ii) Customer shall use the Equipment properly and according to Seller's instructions, complying with all safety requirements; (iii) Customer shall not remove or change any instructions or warnings placed on the Equipment, or remove or modify any safety devices installed by Seller; and (iv) Customer shall use, and install the products in accordance with all applicable laws and codes. Customer shall indemnify and hold harmless the Seller, and, if so requested, defend the Seller, from any and all costs, claims, damages, judgments and expenses (including reasonable attorney fees) suffered or incurred by Seller that arise out of, or as a result of or in connection with, any act, omission, or use of the Equipment by Customer or its employees, agents, or customers, or any breach by Customer of these Terms. Customer shall notify the Seller promptly, and in any event within thirty days, of any accident or malfunction involving the Equipment which results in personal injury or damage to the property and shall cooperate fully with the Seller in investigating and determining the cause of such accident or malfunction.

IAT Terms and Conditions, John Zink's App. at 149.

In addition to the terms and conditions previously noted, IAT's terms and conditions contained a disclaimer of warranties which provided in pertinent part:

13. Disclaimer of Warranties; Customer's Exclusive Remedy. THE WARRANTIES HEREIN ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE. SELLER MAKES NO OTHER WARRANTIES EITHER EXPRESS OR IMPLIED. IN PARTICULAR, SELLER MAKES NO WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. SELLER SHALL HAVE NO LIABILITY TO CUSTOMER FOR DIRECT, CONSEQUENTIAL, OR INCIDENTAL DAMAGES OF ANY KIND WHATSOEVER, INCLUDING BUT NOT LIMITED TO PERSONAL

14

INJURY, PROPERTY DAMAGES, LOST PROFITS, OR OTHER ECONOMIC INJURY DUE TO ANY DEFECT IN THE EQUIPMENT, ANY USE OR INABILITY TO USE THE EQUIPMENT, OR ANY OTHER BREACH BY SELLER OF THIS CONTRACT. SELLER SHALL HAVE NO LIABILITY TO CUSTOMER IN TORT (INCLUDING WITHOUT LIMITATION NEGLIGENCE) FOR ANY PRODUCT LIABILITY CONCERNING THE EQUIPMENT, OR FOR THE OMISSION OF ANY WARNING THEREFROM. THE FOLLOWING REMEDY SHALL CONSTITUTE THE SOLE AND EXCLUSIVE REMEDIES OF CUSTOMER UNDER THE CONTRACT AND IS EXPRESSLY MADE IN SUBSTITUTION OF ANY AND ALL OTHER REMEDIES.

The Seller warrants that the Equipment will be free of defects in workmanship and material (if properly installed, operated and maintained) for a period of one year or 2080 hours of use, whichever is sooner, from date of shipment to Customer, subject to the limitations hereunder set forth. If within the one year warranty period, the Seller receives from Customer written notice of any defects in the Equipment and if the Equipment is not found to be in conformity with this warranty (the Customer having provided the Seller a reasonable opportunity to perform any appropriate tests thereon) Seller will, at its option, either repair the Equipment or supply a replacement therefore. . . .The Seller's liability shall be solely limited to the supplying of replacement parts and materials.

IAT Terms and Conditions, John Zink's App. at 149-50.

IAT's terms and conditions also contained a provision regarding the voiding of warranties which provided as follows:

E. All warranties shall be null and void where the Equipment has been subjected to accident, altered, misused or abused, or Customer has failed to ensure proper storage, installation, operation and/or maintenance of the Equipment. Use of the

15

> Equipment in improper or non-recommended applications (including operation above load capacity), or use of parts or components not meeting the Seller's specifications or quality standards (e.g., non-Industrial Air Technology parts or components) renders all warranties null and void.

IAT Terms and Conditions, John Zink's App. at 151. IAT's terms and conditions also contained a choice of law clause that provided that the contract "shall be governed by and interpreted according to Michigan law. . . " IAT Terms and Conditions, John Zink's App. at 152.

After receiving Leeseberg's fax on April 28, 2005, Benson gave the IAT terms and conditions to Nash. Benson never saw the IAT terms and conditions again after that point and before the commencement of this lawsuit. Benson did not talk to his supervisor, Robert Dawkins, about the IAT terms and conditions, nor did he discuss the terms and conditions with anyone in the John Zink legal department.

On May 12, 2005, Benson provided Nash with Leeseberg's April 28, 2005, fax, including IAT's terms and conditions. On May 12, 2005, Nash sent an e-mail to Benson in which he stated:

> Paul,
>
> This morning you put a document in my office that yoiu [sic] received from **Industrial Air Technology Corp.** It is their "Terms of Sale Rider-Standard Terms and Conditions of Sale". I assume this is the terms and conditions they are using as the governing contract.
>
> What am I supposed to do with these terms? Just file them? Or are these supposed to be revised by Robert Dawkins and the Legal Department? At the present time we do not have any terms and conditions in place that have been approved by both

> parties. Until we do, I have to mark this vendor as non-
> compliant with respect to the Terms & Conditions.
>
> Please advise what I am to do with this document.
>
> Malcolm Nash
> Purchasing Department
> John Zink Company L.L.C.

Nash e-mail, IAT's App. at 59.

No one at John Zink ever agreed in writing to accept the IAT terms and conditions. Neither Benson or any anyone else at John Zink ever spoke to Leeseberg again. Leeseberg's last contact with John Zink was the April 28, 2005, fax. After April 28, 2005, neither Benson or Nash ever wrote Leeseberg to indicate that John Zink was not accepting IAT's terms and conditions.

On or about June 7, 2005, the two fans were shipped by IAT to the VeraSun Fort Dodge plant. On June 13, 2005, IAT billed John Zink for the two fans. John Zink paid for the two fans on or about August 16, 2005.

Some fans come with vibration switches and some do not. IAT designs and sells more fans like the VeraSun fans without vibration switches than with vibration switches. The fans supplied to VeraSun by IAT came with and incorporated a vibration switch on each fan. John Zink had specified that it wanted a vibration switch for each fan. The vibration switches were designed to monitor the vibration levels of each of the fans and to give off an alarm if there was an increase in the vibrations that breached a certain setting and to trip or shut down the fan if the high vibration level continued. The switches were considered to be safety switches or devices and were designed to notify the plant manager if the vibration exceeded a certain set limit and permit the equipment to be checked. The trip part of the vibration switch can shut the fan down and, in this case, the switches were

wired into a trip circuit which would shut the fan down.  Because the switches were wired into a trip circuit, they were considered to be safety devices.

According to Leo Weinberg, an employee of John Zink who was the project manager for John Zink at the VeraSun Fort Dodge project, if it was determined that a fan's vibration could cause a problem, the fan should be shut down.  John Zink and VeraSun would be the companies to shut a fan down.

The thermal oxidizer units, including the IAT fans, were subsequently installed in the VeraSun ethanol plant in Fort Dodge.  During the start up of thermal oxidizer #2, the IAT fan on thermal oxidizer #2, for unknown reasons, was continually shutting down.  It was believed that the vibration switch was tripping the fan.  It was also believed that when the thermal oxidizer system encountered a main fuel trip, the thermal oxidizer #2 fan would also be tripped or shut down.  Each time the thermal oxidizer #2 fan tripped or shut down, the motor could not be restarted for a period of time.  The delays for restarting interfered with John Zink's diagnostic work and created down time.  To avoid these delays caused by the fan's tripping, Matt Janes of VeraSun approached Robert Lanoue from John Zink and inquired if there was anything that could be done to keep the fan in operation and to avoid the fan being tripped.  Lanoue suggested putting in a jumper.  Janes agreed and the jumper was installed.  The vibration switch to thermal oxidizer #1 was not jumpered.

Before the jumper was installed, if the master fuel trip tripped, the fan would shut down.  Lanoue installed a jumper to keep the fan motor in operation when the thermal oxidizer system encountered a main fuel trip.  He wired the controls such that the signal that tells the motor to start was supplied constant power.  Lanoue jumped power to the fan motor so the fan motor would remain in operation.  In doing this, he bypassed the stop. This jumpering to allow the fan motor to run constantly was done around September 1, 2005, or September 2, 2005. After the jumpering of the fan's motor on thermal oxidizer

18

#2, it is believed that the fan ran constantly from September 1, 2005 or September 2, 2005, through September 10, 2005. During the evening of September 10, 2005, the IAT fan on thermal oxidizer #2 exploded. After the explosion on thermal oxidizer #2, VeraSun shut down thermal oxidizer #1 in order to check the other IAT fan. None of the ICM start up reports from the day of the accident or the days just prior to the accident make any reference to excessive vibration being a problem.

Jim Van Dusen was IAT's field representative in September 2005. IAT sent him to the VeraSun plant after the fan on thermal oxidizer #2 exploded. On September 12, 2005, Van Dusen and others inspected the fan on thermal oxidizer #1. He observed cracks in the fan and agreed that the fan was unsafe to use and that it should be taken out of service. Following the shutdown of the VeraSun plant, IAT redesigned and manufactured replacement fan wheels for the fans that had failed. However, IAT halted delivery of the replacement fan wheels when a stress analysis performed by Nodal Techniques on the design of the new wheels revealed a significant possibility that they would fail in the same manner as the first two. Based on the information available in September 2005, IAT determined that the replacement fan wheels were not satisfactory for use. The IAT fan wheels were never delivered to the VeraSun plant and VeraSun proceeded with purchasing replacement fans from a different supplier.

Following the incident on September 10, 2005, questions arose regarding what warranty was applicable to the IAT fans at issue. On Monday, September 12, 2005, Harley Cooper, a John Zink employee, sent an e-mail to Robert Dawkins at John Zink seeking assistance from Robert Dawkins. Dawkins was Paul Benson's boss. In the September 12, 2005, e-mail, Cooper wrote in part:

Here is the assistance we need:

> 1. Our contract with the customer is that we assign our supplier warranties to the customer. Please forward the terms and conditions of the purchase that we have with our supplier which I can provide to the customer.

Cooper e-mail, IAT's App. at 65. The supplier reference in Cooper's e-mail was IAT.

On September 14, 2005, Matt Janes sent an e-mail to Don Endres following a discussion with Rick Iwamoto, a John Zink Vice-President, in which he wrote in part:

> What is Zink's responsibility to correct this problem?
> - Iwamoto said that Zink's responsibility is limited to "passing through" the vendor warranty.
> - He said that they would act as our agent but not have direct responsibility.

Janes e-mail, IAT's App. at 67.

On September 15, 2005, Mark McCorkle, from ICM, sent an e-mail to Jeff See and copied in Matt Janes, Don Endres and others. In his e-mail, in which McCorkle expressed some safety concerns, he wrote in part that:

> The specifications from ICM for these fans noted the use of vibration alarms that would alert the operators of excessive vibrations that would eventually shut the motor down. The specification is intended for the safety of the operators and for prevention of such catastrophes that were encountered last Saturday night. We were also informed that the motor was jumpered out in an effort to keep the fan running which served its purpose since the motor continued to run after the collapse of the scroll and had to be turned off inside the MCC room at the panel. An ICM employee informed John Zink about the vibrations and the need to resolve the problem just the day before the incident.

McCorkle e-mail, IAT's App. at 69.

On November 4, 2005, Rick Iwamoto, a John Zink Vice-President, sent a letter to VeraSun and Fagen in which he wrote:

20

John Zink Company, L.L.C. is in receipt of the VeraSun letter of October 26, 2005, sent to Fagen, Inc., John Zink and Industrial Air Technology regarding the blower equipment defect which occurred at the VeraSun facility on September 10, 2005.

The warranty applicable to the defective equipment is the warranty of the blower manufacturer, which was assigned by John Zink to Fagen under the terms of the Fagen/John Zink purchase order. The remedy available under the Fagan[sic]/John Zink purchase order for the defective equipment is repair or replacement of the blower equipment. John Zink met its contractual obligations when the defective blower equipment was replaced.

In order to expedite repairs, at the request of VeraSun, John Zink issued a purchase order to an alternate blower manufacturer and paid for the replacement blower equipment. In turn, VeraSun was to issue a like order to John Zink and John Zink was to obtain payment from Industrial Air for the purchase order price of the blower order issued and forward the payment received to VeraSun.

We trust you continue to agree that, other than seeking reimbursement for the blower equipment order, John Zink has no responsibility for any other or further costs or damages as regards to the defect in question and is in no event responsible for any other costs or damages of any kind, to include, but not limited to, consequential damages.

We appreciate VeraSun working with us to have the defective equipment replaced. John Zink will continue to work with all of the parties on future tasks involving this purchase order and supports the amicable working relationship between our companies.

Iwamoto letter, IAT's App. at 66.

## II. LEGAL ANALYSIS

### A. Summary Judgment Standards

Motions for summary judgment essentially "define disputed facts and issues and . . . dispose of unmeritorious claims [or defenses]." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1982 (2007); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. . . ."). Any party may move for summary judgment regarding "all or any part" of the claims asserted in a case. FED R. CIV. P. 56(a), (b) (allowing a claimant to move for summary judgment "at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party," and allowing a defending party to move for summary judgment "at any time"). Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no *genuine* issue of *material* fact and that the moving party is entitled to a judgment as a matter of law." *Id*. 56(c) (emphasis added); *see Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) ("Summary judgment is appropriate if viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.").

A fact is *material* when it "'might affect the outcome of the suit under the governing law.'" *Johnson v. Crooks*, 326 F.3d 995, 1005 (8th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Thus, "the substantive law will identify which facts are material." *Anderson*, 477 U.S. at 248. Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id*. An issue of material fact is *genuine* if it has a real basis in the record, *Hartnagel v.*

*Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question," *Woods*, 409 F.3d at 990 (quoting *Anderson*, 477 U.S. at 248); *see Diesel Machinery, Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 832 (8th Cir. 2005) (stating genuineness depends on "whether a reasonable jury could return a verdict for the non-moving party based on the evidence"). Evidence presented by the nonmoving party that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, such as a "scintilla of evidence," *Anderson*, 477 U.S. at 252; *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 113 F.3d 1484, 1492 (8th Cir. 1997), or evidence that is "merely colorable" or "not significantly probative," *Anderson* at 249-50, does not make an issue of material fact genuine.

Thus, a *genuine issue of material fact* is not the "mere existence of some alleged factual dispute between the parties." *State Auto. Ins. Co. v. Lawrence*, 358 F.3d 982, 985 (8th Cir. 2004). "'Instead, "the dispute must be outcome determinative under prevailing law."'" *Mosley v. City of Northwoods*, 415 F.3d 908, 910-11 (8th Cir. 2005) (quoting *Get Away Club, Inc. v. Coleman*, 969 F.2d 664, 666 (8th Cir. 1992), in turn quoting *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989)). In other words, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49. Essentially, a genuine issue of material fact determination, and thus the availability of summary judgment, is a determination of "whether a proper jury question [is] presented." *Id.* at 249. A proper jury question is present if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

23

Procedurally, the moving party does not have to "support its motion with affidavits or other similar materials *negating* the opponent's claim," *Celotex*, 477 U.S. at 323, but the moving party does bear "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Thus, a movant need only demonstrate the absence of a genuine issue of material fact and that it is entitled to judgment according to law. *See Celotex*, 477 U.S. at 323 ("[T]he motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Mosley*, 415 F.3d at 910 ("The nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.'" (quoting *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995))). Thus, the movant must show the absence of a genuine issue of material fact as it relates to the substantive law, and the nonmovant must show the alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 322; *In re Temporomandibular Joint*, 113 F.3d at 1492.

In considering whether a genuine issue of material fact is present the court must view all the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88; *Mosley*, 415 F.3d at 910. Further, the court must give such party the

benefit of all reasonable inferences that can be drawn from the facts. *Matsushita*, 475 U.S. at 587-88. However, "because we view the facts in the light most favorable to the non-moving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Rather than "attempt[ing] to determine the truth of the matter . . . the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

Of course, the facts are not the sole concern of the court; after all, a genuine issue of material fact necessarily depends on the substantive law. *See Holloway*, 884 F.2d at 366 ("The presence of a genuine issue of fact is predicated on the existence of a legal theory which can be considered viable under the nonmoving party's version of the facts. The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under prevailing law."). Thus, the relevant law concerning plaintiff's claims is pivotal. *Anderson*, 477 U.S. at 252 ("[T]he inquiry involved in a ruling on a motion for summary judgment . . . necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits."); *see Brandon v. Lotter*, 157 F.3d 537, 539 (8th Cir. 1998) ("'In ruling on a motion for summary judgment, the court must bear in mind the actual quantum and quality of proof necessary to support liability under the applicable law.'" (quoting *Hartnagel*, 953 F.2d at 396)). Even if no genuine issue of material fact is present, summary judgment is not appropriate unless the governing law supports the moving party's position. FED. R. CIV. P. 56(c) (requiring the moving party to show that it "is entitled to judgment as a matter of law"). Moreover, summary judgment is particularly appropriate "where the unresolved issues are primarily legal rather than factual." *Aucutt v. Six Flags Over Mid-America, Inc.*, 85 F.3d 1311, 1315 (8th Cir. 1996).

With these standards in mind, the court turns to consideration of the parties' cross-motions for partial summary judgment and summary judgment.

## B. Analysis Of Issues

Because of the overlap in the issues raised in the parties' motions, the court will proceed by addressing the issues *seriatim*.

### 1. Choice-of-law determination

The first issue the court is called upon to address in this diversity case is what state's law is controlling in determining the terms of the contract between John Zink and IAT. Federal district courts apply the choice of law rules of the state in which they sit when jurisdiction is based on diversity of citizenship. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Allianz Ins. Co. v. Sanftleben*, 454 F.3d 853, 855 (8th Cir. 2006); *DCS Sanitation Mgmt., Inc. v. Castillo*, 435 F.3d 892, 895 (8th Cir. 2006); *Heating & Air Specialists, Inc. v. Jones*, 180 F.3d 923, 928 (8th Cir. 1999); *Baxter Int'l v. Morris*, 976 F.2d 1189, 1195 (8th Cir. 1992); *Whirlpool Corp. v. Ritter*, 929 F.2d 1318, 1320 (8th Cir. 1991). Thus, in this case, Iowa's choice-of-law rules govern. Iowa has adopted the Second Restatement of Conflicts as its choice-of-law provision. *Henriksen v. Younglove Constr.*, 540 N.W.2d 254, 259 (Iowa 1995). The Restatement (Second) of Conflicts § 187 indicates that, with certain exceptions not relevant here, "[t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied." The difficulty with applying § 187 in this case is that John Zink's terms and conditions call for application of Oklahoma law while IAT's terms and conditions provide that Michigan law is to govern. Even though John Zink's and IAT's respective terms and conditions contain competing choice-of-law provisions, because the contract at issue in this case concerns the sale of goods and all three possible states whose law might govern the issues

at hand-Iowa, Michigan and Oklahoma-have adopted sections 2-201 to 2-210 of the Uniform Commercial Code, *see* IOWA CODE §§ 544.2201-554.2210; MICH. COMP. LAWS §§ 440.2201-440.2209; OKLA. STAT. §§ 2-201-2-210, it is unnecessary to resolve this choice-of-law conflict.[1] *See PCS Nitrogen Fertilizer, L.P. v. Christy Refractories, L.L.C.,* 225 F.3d 974, 977 n.2 (8th Cir. 2000); *N & D Fashions, Inc. v. DHJ Indus., Inc.,* 548 F.2d 722, 724 n.2 (8th Cir. 1976); *see also Textile Unlimited, Inc. v. A..BMH & Co. Inc.,* 240 F.3d 781, 787 n.2 (9th Cir. 2001); *Lambert v. Kysar,* 983 F.2d 1110, 1114 (1st Cir. 1993). Accordingly, because there has been no showing of a conflict of laws, the court will look to interpretations of the U.C.C. from Iowa, Michigan, and Oklahoma.[2]

## 2.  *Terms and conditions of contract*

The chief point at issue between the parties to this dispute concerns whether John Zink's terms and conditions or IAT's terms and conditions were made a part of the contract for the sale of the two IAT fans. A determination of the terms of the contract between John Zink and IAT must begin with identification of the offer and acceptance. In order to resolve this question, the court must consider each of the documents exchanged between John Zink and IAT and ascertain their legal significance.

---

[1]It is undisputed that both John Zink and IAT are merchants for the purposes of the UCC. U.C.C. § 2-104(1) (defining the term "merchant").

[2]The U.C.C. applies to "transactions in goods." U.C.C. § 2-102. "Goods" are "all things (including specially manufactured goods) which are moveable at the time of identification to the contract. . . ." U.C.C. § 2-105. Because the contracts at issue in this litigation concern the sale of goods, the U.C.C. is applicable in this matter.

### a. The offer

On February 23, 2005, John Zink submitted to Osborn, IAT's manufacturer's representative and agent, a request for proposal for two counterclockwise rotating induced draft fans. Osborn, in turn, forwarded the bid request to IAT. On March 3, 2005, IAT, through Osborn, sent a quotation to John Zink, quoting a price of $170,020.00 for the two fans. Thus, the court must determine whether the March 3rd quotation qualifies as an "offer" for purposes of forming a contract under the U.C.C. The UCC does not define the term "offer." *Nordyne, Inc. v. International Controls & Measurements Corp.*, 262 F.3d 843, 846 (8th Cir. 2001). Rather, "courts . . . must continue to first look to the common law to determine which communication constituted the 'offer' in order to apply [the contract formation principles of the UCC]." *Gulf States Utils. Co. v. NEI Peebles Electric Prods., Inc.,* 819 F. Supp. 538, 549 (M.D. La. 1993). As this court noted previously, "[u]nder Iowa law, an offer is a "'manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his [or her] assent to that bargain is invited and will conclude it.'"" *Tralon Corp. v. Cedarapids, Inc.*, 996 F. Supp. 812, 822 (N.D. Iowa 1997) (quoting *Magnusson Agency v. Public Entity Nat'l Co. Midwest,* 560 N.W.2d 20, 26 (Iowa 1997) (quoting in turn *Anderson v. Douglas & Lomason Co.,* 540 N.W.2d 277, 285 (Iowa 1995)).[3]

Courts have found it difficult to determine when a price quotation constitutes a definite offer and when it is merely a preliminary step in negotiations leading to an offer. However, in general, "a price quotation is considered an invitation for an offer, rather than an offer to form a binding contract." *White Consol. Indus., Inc. v. McGill Mfg. Co.,* 165

---

[3]The Restatement (Second) of Contracts § 24 defines offer as "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it."

F.3d 1185, 1190 (8th Cir. 1999); *accord Nordyne, Inc.*, 262 F.3d at 846 ("The general rule is that a price quotation, such as one appearing in a catalogue or on a flyer, is not an offer, but is rather a suggestion to induce offers by others."); *Litton Microwave Cooking Prods. v. Leviton Mfg. Co.,* 15 F.3d 790, 794 (8th Cir. 1994) (noting that "price quotes and catalogs generally are not offers to form a contract."); *Tralon Corp.*, 996 F. Supp. at 823 (noting that "[t]he general rule is price quotations are not offers, but rather constitute mere invitations to enter into negotiations or to submit offers."); *see E.C. Styberg Eng'g Co. v. Eaton Corp.*, 492 F.3d 912, 918 (7th Cir. 2007) (noting that "typically, a price quotation is considered an invitation for an offer, rather than an offer to form a binding contract."); *Dyno Const. Co. v. McWane, Inc.*, 198 F.3d 567, 572 (6th Cir. 1999) ("'Typically, a price quotation is considered an invitation for an offer, rather than an offer to form a binding contract.'") (quoting *White Consol. Indus., Inc.,* 165 F.3d at 1190); *see also Babcock & Wilcox Co. v. Hitachi Am., Ltd.* 406 F. Supp. 2d 819, 827 (N.D. Ohio 2005); *Manhattan Const. Co. v. Rotek, Inc.*, 905 F. Supp. 971, 974 (N.D. Okla.1995); *Bergquist Co. v. Sunroc Corp.,* 777 F. Supp. 1236, 1248 (E.D. Pa.1991); *Master Palletizer Sys., Inc. v. T.S. Ragsdale Co.,* 725 F. Supp. 1525, 1531 (D. Colo.1989), *aff'd,* 937 F.2d 616 (10th Cir. 1991); *Corinthian Pharm. Sys., Inc. v. Lederle Labs.,* 724 F. Supp. 605, 609 (S.D. Ind.1989); *Maurice Elec. Supply Co., Inc. v. Anderson Safeway Guard Rail Corp.,* 632 F. Supp. 1082, 1087 (D.D.C.1986). "[T]he purchase order usually is the first document having the legal attributes of an offer." *Gulf States Utils. Co,* 819 F. Supp. at 549; *accord Rich Prods. Corp. v. Kemutec*, 66 F. Supp.2d 937, 956 (E.D. Wis. 1999) (quoting *Gulf States Utils. Co,* 819 F. Supp. at 549); *see Dyno Const. Co.*, 198 F.3d at 572 (noting that "a buyer's purchase agreement submitted in response to a price quotation is usually deemed the offer."). Nevertheless, there are situations where a price quotation may constitute an offer, turning a subsequent purchase order into an acceptance.

*See Nordyne*, 262 F.3d at 846 (noting that under Missouri law that "a price quotation, 'if detailed enough, can amount to an offer creating the power of acceptance; to do so it must reasonably appear from the price quote that assent to the quote is all that is needed to ripen the offer into a contract.'") (quoting *Brown Mach., Div. of John Brown, Inc. v. Hercules, Inc.,* 770 S.W.2d 416, 419 (Mo. Ct. App. 1989)); *see also Dyno Const. Co.,* 198 F.3d at 572 ("However, a price quotation may suffice for an offer if it is sufficiently detailed and it 'reasonably appear[s] from the price quotation that assent to that quotation is all that is needed to ripen the offer into a contract.'") (quoting *Quaker State Mushroom Co. v. Dominick's Finer Foods, Inc., of Illinois,* 635 F. Supp. 1281, 1284 (N.D. Ill. 1986)); *Crest Ridge Constr. Group, Inc. v. Newcourt, Inc.,* 78 F.3d 146, 152 (5th Cir. 1996) ("A price quotation, if detailed enough, can constitute an offer capable of acceptance."); *Quaker State Mushroom Co. Inc., v. Dominick's Finer Foods, Inc.,* 635 F. Supp. 1281, 1284 (N.D. Ill. 1986) ("If detailed enough, a price quotation can amount to an offer creating the power of acceptance."). The difficulty lies in characterizing what is required for a price quotation to be treated as an offer. The Eighth Circuit Court of Appeals has observed that "[f]actors relevant in determining whether a price quotation is an offer include the extent of prior inquiry, the completeness of the terms of the suggested bargain, and the number of persons to whom the price quotation is communicated." *Nordyne*, 262 F.3d at 846 (citing Restatement (Second) of Contracts § 26, comment c). With these principles in mind, the court turns to consider the quotation at issue here.

Upon review of the undisputed facts in the summary judgment record, that court concludes that IAT's quotation of March 3, 2005, was an offer. First, the court notes that the quotation was not the initial substantive contact between the parties. Prior to IAT sending John Zink its quotation, John Zink had contacted IAT's business representative Osborn, sent Osborn two specification sheets for the fans and requested that IAT provide

a quotation for the two fans with "forced lubrication systems." Second, IAT's quotation contained all the necessary elements of an offer. Specifically, IAT's quotation contained, *inter alia*, the following: a complete description of the two fans, with two corresponding performance charts; the quantity of goods; the fans' price; an anticipated delivery date; and the general length of the fans' warranty. As such, nothing of significance is lacking in these terms which would preclude it from constituting an offer. The details which are missing such as specific warranty provisions, choice-of-law clauses, and cancellation provisions are terms which either the U.C.C. or the common law provide as "gap-fillers." "Gap-fillers" are by definition unnecessary for a document to serve as an offer. *See Step-Saver Data Sys. Inc. v. Wyse Tech.,* 939 F.2d 91, 100 (3rd Cir. 1991) (noting that the absence of certain warranty terms immaterial in light of U.C.C.'s gap-filling provisions). Indeed, federal courts have held quotations to be "offers" on facts similar to those found in this case. *See White Consol. Indus., Inc.,* 165 F.3d at 1191 (holding that seller's detailed price quotation that provided that it was subject to immediate acceptance by buyer was offer); *see also Architectural Metal Sys. Inc. v. Consolidated Sys., Inc.* 58 F.3d 1227 (7th Cir. 1995) (holding that price quotation specifying items to be sold, the quantity and price of each item constituted an offer); *Northrop Corp. v. Litronic Indus.*, 29 F.3d 1173, 1176 (7th Cir. 1994) (holding that quotations submitted in response to request for offers to produce printed wire boards for defense systems constituted offers within meaning of the U.C.C.); *Reaction Molding Tech., Inc. v. General Elec. Co.,* 585 F. Supp. 1097, *amended,* 588 F. Supp. 1280 (E.D. Pa.1984) (holding that quotation sent in response to buyer's request and containing terms of description, price, and payment constituted offer); *Dave's Cabinets, Inc. v. Komo Mach., Inc.*, No. 05-854, 2006 WL 1877075, at *2 (D. Minn. 2006) (concluding that quotation constituted "a valid contract because it was 'sufficiently detailed'" where the offer "listed all of the Mach III's features, the price of

the machine, and the terms and conditions of the sale.") (quoting *White Consol. Indus., Inc.,* 165 F.3d at 1190). Third, this was a specific quotation custom-designed for a specific customer at that customer's request and not a generalized or unsolicited quote sent to a number of potential customers, such as price lists in a catalog or other form of direct mail marketing. The court notes that no further negotiations ensued between the time that John Zink received IAT's quotation and John Zink sending IAT a purchase order on March 10, 2005. *See Dyno Const. Co.,* 198 F.3d at 573-74 (holding that defendant seller's price quotation for pipe and fittings was not an offer and that no contract was formed where the price quotation contained words such as "estimate" and "please call," which the court determined were indications of an intent to engage in subsequent negotiations). Finally, the court must point out that IAT's quotation does not contain any reservation of any right to accept or reject any order submitted in response to its quotation. Nor did anyone at IAT communicate such condition to John Zink. Thus, the court concludes that IAT's quotation of March 3, 2005, constituted an offer to John Zink.

### b. *The counteroffer*

Having concluded that IAT's quotation constituted an offer, the acceptance of which constitutes a valid contract, the court must now consider the nature of John Zink's purchase order of March 10, 2005. The court concludes that John Zink's purchase order accepted IAT's offer of March 3, 2005. However, John Zink's purchase order contained John Zink's terms and conditions for the sale, terms and conditions which were absent from IAT's offer. At common law, under the "mirror image" rule, any discrepancy between the offer and the acceptance would prevent the offeree's response from operating

as an acceptance so there would be no contract in such a case.[4] *See Challenge Mach. Co. v. Mattison Mach. Works,* 138 Mich. App 15, 22; 359 N.W. 2d 232, 235 (1984) ("At common law, the failure of the responding document to mirror the terms of the offer would have precluded the formation of a contract."); *Foamade Indus. v. Visteon Corp,* No. 271949, 2008 WL 582566, at *7 (Mich. Ct. App. Mar. 4, 2008) (same, quoting *Challenge Mach. Co.,* 138 Mich. App at 22; 359 NW2d at 235); *see also JOM, Inc.v. Adell Plastics, Inc.*, 193 F.3d 47, 53 (1st Cir. 1999) ("Under the so-called "mirror image" rule which prevailed at common law, an invoice from the seller containing terms materially different from those in the buyer's offer would be considered a mere counteroffer, rather than an acceptance of the offer. Thus, no contract came into existence unless the buyer subsequently accepted the counteroffer. . ."); *Northrop Corp.*, 29 F.3d at 1176 ("At common law, any discrepancy between the forms would prevent the offeree's response from operating as an acceptance. So there would be no contract in such a case. This was the "mirror image" rule. . .) (citation omitted); *Litton Microwave Cooking Prods. v. Leviton Mfg. Co.,* 15 F.3d 790, 794 (8th Cir. 1994) ("It was once the law, under the 'mirror image' rule, that an offer had to be accepted exactly 'as is' or the response

---

[4]However, as the Third Circuit Court of Appeals has explained:

> If the offeror proceeded with the contract despite the differing terms of the supposed acceptance, he would, by his performance, constructively accept the terms of the "counteroffer", and be bound by its terms. As a result of these rules, the terms of the party who sent the last form, typically the seller, would become the terms of the parties's contract. This result was known as the "last shot rule".

*Step-Saver Data Sys., Inc. v. Wyse Tech.*, 939 F.2d 91, 99 (3rd Cir. 1991).

amounted only to a counter-offer. There was no contract unless the original offeror accepted the counter-offer."); *Union Carbide Corp. v. Oscar Mayer Foods Corp.*, 947 F.2d 1333, 1335 (7th Cir. 1991) ("The common law rule was that if the purported acceptance of an offer was not identical to the offer, the acceptance was a fresh offer and had to be expressly accepted by the original offeror for the parties to have a contract."); *Step-Saver Data Sys., Inc. v. Wyse Tech.*, 939 F.2d 91, 98-99 (3rd Cir. 1991) ("Under the common law of sales, and to some extent still for contracts outside the UCC, an acceptance that varied any term of the offer operated as a rejection of the offer, and simultaneously made a counteroffer. This common law formality was known as the mirror image rule, because the terms of the acceptance had to mirror the terms of the offer to be effective."). Article 2 of the U.C.C. abandoned the "mirror image" rule. *See Deere & Co. v. Ohio Gear*, 462 F.3d 701, 707 (7th Cir. 2006) ("UCC § 2-207(1) rejects the common law "mirror image" rule. . ."); *Architectural Metal Sys., Inc. v. Consolidated Sys., Inc.*, 58 F.3d 1227, 1230 (7th Cir. 1995) (observing U.C.C.'s "rejection of the common law's 'mirror image' rule."); *Northrop Corp.*, 29 F.3d at 1176 (noting that the mirror image rule was "jettisoned" by Article 2 of the U.C.C.); *Step-Saver Data Sys., Inc.*, 939 F.2d at 98-99 (noting that U.C.C. rejected the "mirror image' rule); *Idaho Power Co. v. Westinghouse Elec. Corp.*, 596 F.2d 924, 926 (9th Cir. 1979) ("Section 207, however, rejects the "mirror image" rule, and converts a common law counteroffer into an acceptance even though it states additional or different terms."); *Transwestern Pipeline Co. v. Monsanto Co.,* 46 Cal. App.4th 502, 514, 53 Cal. Rptr.2d 887, 893 (1996) ("Section 2207 replaces the common law 'mirror image' rule which required an acceptance to 'mirror' the offer, i.e., to reiterate all terms and conditions exactly," replacing it with a rule that "the common law counteroffer becomes an acceptance if it contains a 'definite and seasonable expression of acceptance' and, between merchants, the additional terms of

the 'counteroffer' become a part of the contract."). As two commentators on the subject have explained:

> The rigidity of the common law rule ignored the modern realities of commerce. Where preprinted forms are used to structure deals, they rarely mirror each other, yet the parties usually assume they have a binding contract and act accordingly. Section 2-207 rejects the common law mirror image rule and converts many common law counteroffers into acceptances under 2-207(1).

JAMES J. WHITE & ROBERT S. SUMMERS, HANDBOOK OF THE LAW UNDER THE UNIFORM COMMERCIAL CODE § 1-3 at 29-30 (3d ed. 1988) (footnotes omitted).

The U.C.C. rejected the common law approach. Instead, in U.C.C. § 2-207 the U.C.C. established

> a legal rule that proceeding with a contract after receiving a writing that purports to define the terms of the parties's contract is not sufficient to establish the party's consent to the terms of the writing to the extent that the terms of the writing either add to, or differ from, the terms detailed in the parties's earlier writings or discussions. In the absence of a party's express assent to the additional or different terms of the writing, section 2-207 provides a default rule that the parties intended, as the terms of their agreement, those terms to which both parties have agreed, along with any terms implied by the provisions of the UCC.

*Step-Saver Data Sys., Inc.*, 939 F.2d at 99 (footnotes omitted); *accord Challenge Mach. Co.,* 138 Mich. App. at 22; 359 N.W.2d at 235 ("The UCC, however, altered this "mirror-image" rule by providing that the inclusion of additional or different terms would not prevent the acceptance from being operative unless the acceptance was made conditional on the assent of the other party to those additional or different terms.").

Iowa, Michigan and Oklahoma have all adopted section 2-207 of the UCC. *See* IOWA CODE § 544.2207; MICH. COMP. LAWS § 440.2207; OKLA. STAT. § 2-207. Section 2-207, as codified at § 2-207 of the Oklahoma Statutes, provides:

> (1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.
>
> (2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:
>
> > (a) the offer expressly limits acceptance to the terms of the offer;
> > (b) they materially alter it; or
> > (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.
>
> (3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this act.

OKLA. STAT. § 2-207.[5]

---

[5] Iowa and Michigan's codification of U.C.C. 2-207 are identical to Oklahoma's in all meaningful ways. *See* IOWA CODE § 554.2207; MICH. COMP. LAWS § 440.2207. Indeed, the only textual difference between the three statues is the last word in subsection

(continued…)

This court previously noted that this section

> allows merchants to contract for the sale of goods without having to negotiate and draft formal contracts. With the adoption of § 2-207, a merchant can accept an offer made on the offeror's form by using his own standardized form so long as the response does not "materially alter" the terms of the offer.

*Tralon Corp.*, 966 F. Supp. at 823.

---

[5] (...continued)
three, with Oklahoma's and Michigan's versions using the term "act" while Iowa's version states "chapter." The court notes that section 2-207 of the U.C.C. was amended in 2003 to provide:

> Subject to section 2-202, if (i) conduct by both parties recognizes the existence of a contract although their records do not otherwise establish a contract, (ii) a contract is formed by an offer and acceptance, or (iii) a contract formed in any manner is confirmed by a record that contains terms additional to or different from those in the contract being confirmed, the terms of the contract are:
>
> (a) terms that appear in the records of both parties;
>
> (b) terms, whether in a record or not, to which both parties agree; and
>
> (c) terms supplied or incorporated under any provision of this Act.

UNIF. COMM. CODE, 1 U.L.A. 397-99 (2004). However, because neither Iowa, Michigan or Oklahoma have adopted the 2003 amendment to U.C.C. § 2-207, the court will not apply that amendment in this case.

As set out in the first subsection of section 2-207, an acceptance will constitute a counteroffer in instances where "acceptance is expressly made conditional on assent to the additional or different terms." *See PCS Nitrogen Fertilizer, L.P. v. Christy Refractories, L.L.C.,* 225 F.3d 974, 979 (8th Cir. 2000); *see also Deere & Co.*, 462 F.3d at 707; *JOM, Inc.,* 193 F.3d at 53; *Textile Unlimited, Inc. v. A..BMH and Co.*, 240 F.3d 781, 787 (9th Cir. 2001); *Diamond Fruit Growers, Inc. v. Krack Corp.*, 794 F.2d 1440, 1443-44 (9th Cir. 1986); *C. Itoh & Co. (America) v. Jordan Int'l Co.*, 552 F.2d 1228, 1235-36 (7th Cir. 1977). Courts have held that conditional language need not precisely track the "expressly conditional" language of the U.C.C. so long as the statement clearly communicates the offeree's unwillingness to proceed absent agreement to the additional or different terms. *See C. Itoh & Co. (America)*, 552 F.2d at 1235. This is precisely what occurred here. In response to IAT's offer of March 3, 2005, John Zink submitted a purchase order which stated, in pertinent part, that "acceptance is expressly limited to its terms and conditions as set forth herein." Thus, John Zink's purchase order of March 10, 2005, constituted a counteroffer. *See PCS Nitrogen Fertilizer, L.P.,* 225 F.3d at 979 (finding that seller's customer acknowledgment form which was expressly made conditional on assent to additional or different terms constituted a non-binding counteroffer); *Textile Unlimited, Inc.*, 240 F.3d at 787 (holding that seller's acceptance was expressly made conditional on buyer's assent to the additional or different terms where seller's documents provided that "Seller's willingness to sell yarn to you is conditioned on your acceptance of these Terms of Sale."); *Diamond Fruit Growers, Inc.*, 794 F.2d at 1444 (holding that seller expressly conditioned its acceptance on buyer's assent to the additional terms contained in seller's acknowledgment form where that form provided that seller's "acceptance . . . is hereby expressly made conditional to purchaser's acceptance of the terms and provisions of the acknowledgment form."); *C. Itoh & Co. (America),* 552 F.2d at 1235-36 (holding that

written confirmation was not valid acceptance under § 2-207(1) where it contained an "expressly conditional" provision but constituted a counteroffer).

### c. Acceptance

Having concluded that John Zink's purchase order of March 10, 2005, constituted a counteroffer to IAT's offer of March 3, 2005, the question before the court is whether IAT accepted that counteroffer. Here, evidence of the parties' conduct following John Zink's transmittal of the March 10, 2005, purchase order, raises genuine issues of material fact as to when a contract was formed following subsequent exchanges between IAT and John Zink, and what terms were included in the contract. Thus, the court concludes that the precise nature of the agreement between John Zink and IAT is a factual question, to be decided by the trier of fact. Because there are material issues of fact as to whether John Zink's March 10, 2005, offer to purchase was accepted by IAT and what the terms of the contract are between John Zink and IAT, the parties' motions for summary judgment are denied as to those portions of their respective motions which request the court to declare the controlling terms and conditions of the contract between John Zink and IAT.

### 3.    Contribution and indemnification claims

Because there are material issues of fact with respect to what the terms of the contract are between John Zink and IAT, the court cannot determine the parties' contribution and indemnification claims on the record before it. Accordingly, the parties' motions for summary judgment are also denied as to those portions of their respective motions in which they seek summary judgment on the contribution and indemnification issues in this case.

### III.  CONCLUSION

For the reasons stated above, because the court concludes that genuine issues of material fact have been generated in this matter, the parties' respective motions for partial summary judgment, summary judgment, and cross-motions for summary judgment are denied.

**IT IS SO ORDERED.**

**DATED** this 25th day of November, 2008.

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA